**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LAN-OAK PARK DISTRICT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24-cv-5565 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THE LANSING JOURNAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Local park districts and local newspapers usually play nice in the sandbox. Park districts like the publicity that newspapers can provide, and newspapers like having something to write about. They share a common interest in doing fun things, and talking about the fun things that people are doing.

For whatever reason, the relationship between the local park district and the local newspaper has gone sideways in the town of Lansing, Illinois. And it all has to do with an image of a clock tower.

A decade ago, the Lan-Oak Park District trademarked an image of the clock tower that prominently tells time in a park in downtown Lansing. It's a local landmark.

Lan-Oak's image of the clock tower is a lot harder to find than the clock tower itself. As far as this Court can tell, Lan-Oak doesn't use the image prominently on its website, and it isn't selling products with the image, either. Maybe the products are out there somewhere, but if you want to find them, you have a lot of shopping ahead of you. Even so, Lan-Oak alleges that it uses the image from time to time in marketing materials.

Lan-Oak feels proud of the clock tower. And it isn't alone. The Lansing Journal, a local newspaper, has civic pride for the clock tower, too. In fact, the Lansing Journal uses a drawing of the clock tower on merchandise that it sells on its website. For not a lot of bucks, you can get a t-shirt or a sweatshirt with a large picture of the hulking clock tower. Coffee drinkers can fill up a mug that has a picture of the clock tower, too.

Lan-Oak believes that the Lansing Journal's merchandise infringes on its trademark of the clock tower. So it decided to file a lawsuit. The lawsuit is reminiscent of the old advice about picking a fight with someone who buys ink by the barrel.

Lan-Oak brings four claims against the newspaper, alleging that the Lansing Journal is confusing consumers. The Lansing Journal moved to dismiss.

For the following reasons, the motion to dismiss is granted.

## Background

At the motion-to-dismiss stage, a district court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Lansing, Illinois is a village in Cook County in the southeast corner of Chicagoland. It's on the Indiana border, and it's home to about 30,000 people. It's a small town with a big fight on its hands between the local park district and the local newspaper.

The Lan-Oak Park District maintains 20 parks in Lansing, Illinois. *See* Am. Cplt., at ¶ 5 (Dckt. No. 6). One of those parks is aptly named Park Plaza. *Id.* It's downtown.

Park Plaza features a clock tower. *Id.* at ¶ 6. The imposing, four-faced clock tower watches guard over the city. It's a local landmark.

The parties didn't file a picture of the actual clock tower. But photographs of the clock tower are available online. *See* Betty Burley, *Local Voices: Regarding the Clock Tower*, The Lansing Journal (June 17, 2024), https://thelansingjournal.com/2024/06/17/local-voices-regarding-the-clock-tower; *Lansing, Illinois Street Map & Village Guide*, Lansing Area Chamber of Commerce (Jan. 27, 2016), https://issuu.com/tspubs/docs/lansing_il.

The clock tower is an inviting, open-air, four-legged structure. Each spindly leg appears to be a teal metal pole, buttressed by extra steel pillars below. The legs rise up and support a square edifice with a clock facing in each direction. Large circles that look like wagon wheels appear beneath each clock, and a black pyramid roof sits on top of everything. It's hard to say how tall it is, but it looks noticeably taller than nearby street-lights.

Lan-Oak has trademarked certain logos associated with its parks and programs, including a logo of the clock tower. *Id.* at ¶ 6. Lan-Oak registered the clock-tower logo with the state of Illinois in 2012. *Id.* at ¶ 7.

The publicly available registration on the Secretary of State website doesn't include a picture of the mark, unfortunately. But the name of the mark is "Park Plaza – with logo – words appear on 4 clock faces of Billard Green Clock Tower." *See* PARK PLAZA – WITH LOGO – WORDS APPEAR ON 4 CLOCK TOWER FACES OF BILLARD GREEN CLOCK TOWER, Registration No. 104789 (Office of the Illinois Secretary of State) (available at https://apps.ilsos.gov/trademarksearch/trademarksearch).

The logo itself is shrouded in mystery. The complaint didn't include a picture, and neither did the briefs. This Court was left wondering what Lan-Oak's logo looked like.

To compound the mystery, this Court couldn't find a picture of the logo on the internet, despite more than a little judicial sleuthing. Even the act of sponsoring a competitive hunt by the clerks – with the promise of a reward for the winner – came up empty.

The website of the Lan-Oak Park District does include a *different* logo. It shows, aptly enough, an attractive green oak leaf, surrounded by circles enclosing the phrase "Lan-Oak Park District Since 1949." That logo appears right at the top of each page on its website.

But a logo showing the clock tower? It's nowhere to be seen – literally.

By the look of things, Lan-Oak doesn't have an online shop. At the very least, it doesn't look like Lan-Oak is selling anything with a picture of its clock-tower logo. If Lan-Oak believes that it can capitalize on the value of the clock-tower logo, it's passing on the opportunity.

One wonders how valuable the clock-tower logo could be if no one can find it. If someone infringes on a mark, but no one can find it, does it sound like infringement? If Lan-Oak's logo is out there, it's buried like an acorn.

Putting all of that aside, Lan-Oak's mark does exist. It is registered with the state of Illinois. It's simply hard to find in the public domain.

Again, on a motion to dismiss, this Court must accept the allegations of the complaint as true. And here, the complaint alleges that Lan-Oak's logo of the clock tower "has been actively used for many years . . . in marketing, advertising, and promoting various Park District events, programs, and activities to the Lansing community and the general public." *See* Am. Cplt., at ¶ 7 (Dckt. No. 6). So this Court accepts that allegation. Even so, if Lan-Oak is using the mark, this Court hasn't found an example.

The Lansing Journal is a local independent newspaper. *See* Mtn. to Dismiss, at 2 (Dckt. No. 13). There aren't as many local newspapers as there used to be. But the Lansing Journal keeps the community up to speed on the comings and goings in the neighborhood, and beyond. It gives voice to local voices.

The website of the Lansing Journal includes a page for its online shop. The newspaper sells the products as a way to show civic pride in the community. "Lansing, Illinois, is a unique place in the world, and we have the merch to celebrate that. The collection below includes Lansing landmarks, references to articles we've published (including QR codes), and general Lansing pride." *See* The Lansing Journal SHOP, https://thelansingjournal.com/shop (last visited Mar. 28, 2025).

Consumers can buy t-shirts that celebrate Lansing and its history. One t-shirt, for example, features the historic Ford hangar (where Henry Ford housed airplanes until 1932), the

Vietnam Veterans' Memorial, and other local attractions. Another t-shirt has an attractive cup of hot coffee, surrounded by the phrase "Love Lansing a Latte." *Id.*

The website has roughly a dozen products for sale. A few of them include a picture of the clock tower.

And that's where the trouble began. Lan-Oak came to believe that the Lansing Journal's clock-tower image was infringing on Lan-Oak's clock-tower logo.

By this point, maybe the reader is curious to know what the images look like. This Court was curious too. The complaint talked about the logos, but the logos were nowhere to be seen. And the Court wanted to see them.

So, this Court ordered Lan-Oak to file a "good-quality" picture of the dueling logos. *See* 2/11/25 Order (Dckt. No. 22).

Lan-Oak later filed a few pictures. *See* Pl.'s Resp. (Dckt. No. 23). They were helpful, but they left a little something to be desired. Lan-Oak submitted a fuzzy picture of the Lan-Oak trademark (there are better pictures of Bigfoot), and two grainy pictures of t-shirts sold by the Lansing Journal. *Id.*

Here are the pictures that Lan-Oak filed. The one on the left belongs to Lan-Oak, and the one on the right belongs to the Lansing Journal:

**Lan-Oak:**          **The Lansing Journal:**




To get a better sense of the logo, this Court looked at the Lansing Journal's website. And sure enough, the Lansing Journal uses a picture of the clock tower to hawk all sorts of things, including sweatshirts, t-shirts, coffee mugs, and other merchandise:

  

*See* The Lansing Journal SHOP, https://thelansingjournal.com/shop (last visited Mar. 28, 2025).

It's hard to say how much interest there is in merchandise featuring the Lansing clock tower. Maybe the products are flying off the shelves. Or maybe not.

When you click on one of the t-shirts, it takes you to a page with a close-up view of the Lansing Journal's logo:



*See* Lansing Clock Tower T-Shirt, https://www.teepublic.com/t-shirt/47998432-lansing-clock-tower?store_id=2757741 (last visited Mar. 28, 2025).

Putting it all together, here is a side-by-side comparison of the two competing logos. The one on the left is the as-filed version of the Lan-Oak mark. The one on the right is the picture that appears when you click on a t-shirt on the Lansing Journal's website:

**Lan-Oak:**                                **The Lansing Journal:**

    

*See* Pl.'s Resp. (Dckt. No. 23); Lansing Clock Tower T-Shirt, https://www.teepublic.com/ t-shirt/47998432-lansing-clock-tower?store_id=2757741 (last visited Mar. 28, 2025).

Lan-Oak was none too pleased to discover that the Lansing Journal was selling goods on its website with a picture of the clock tower. Lan-Oak believes that the newspaper is misappropriating Lan-Oak's logo. *See* Am. Cplt., at ¶ 8 (Dckt. No. 6). In Lan-Oak's view, the Lansing Journal's use of the clock-tower logo "is clearly designed to create consumer confusion." *Id.* at ¶ 10.

Lan-Oak asked the Lansing Journal to stop using the clock-tower logo. *Id.* at ¶ 11. The Lansing Journal didn't stop, so Lan-Oak started a lawsuit. *Id.*

The complaint brings four claims under state and federal law. The first claim alleges a violation of the Illinois Trademark Registration and Protection Act, 765 ILCS 1036/1 *et seq.* The next two counts arise under federal law. The second claim alleges false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), and the third claim alleges unfair competition under that statute. The fourth and final claim alleges a violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2.

Lan-Oak originally filed its complaint in state court. The fight between a local park district and a local newspaper does seem like a dispute for a state court around the corner. But the Lansing Journal removed the case to federal court, as it had a right to do. A case with a federal claim can go to federal court.

The Lansing Journal moved to dismiss the complaint in its entirety. *See generally* Mtn. to Dismiss (Dckt. No. 13).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Analysis

## I. The Land of Confusion

A common thread runs through all four claims. Lan-Oak must allege a likelihood of confusion to consumers. *See AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008) ("A necessary element of [Plaintiff]'s infringement and unfair competition claims under both state and federal law is that there be a likelihood of confusion."). The parties agree that each claim requires a likelihood of confusion. *See* Mtn. to Dismiss, at 6 (Dckt. No. 13); Pl.'s Resp., at 3 (Dckt. No. 15).

The Seventh Circuit uses a seven-factor test to assess the likelihood of confusion. Courts consider: "(1) the degree of similarity between the marks in appearance and suggestion; (2) the similarity of the products for which the name is used; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength [or 'distinctiveness'] of the complainant's mark; (6) actual confusion; and (7) an intent on the part of the alleged

7

infringer to palm off his products as those of another." *See Fortres Grand Corp. v. Warner Bros. Ent. Inc.*, 763 F.3d 696, 702 (7th Cir. 2014) (alteration in original) (citations omitted).

The seven factors "are not a mechanical checklist." *See Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir. 2000) (citing *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 381 (7th Cir. 1996)). A district court can consider, but doesn't *have* to consider, each of the seven factors.

"No one factor is decisive." *Id.* And the factors are not created equal. "[T]he similarity of the marks, the intent of the defendant, and evidence of actual confusion are the most important considerations." *Id.*; *see also AutoZone*, 543 F.3d at 929 ("No single factor is dispositive. Courts may assign varying weight to each of the factors depending on the facts presented, though usually the similarity of the marks, the defendant's intent, and actual confusion are particularly important.").

Oftentimes, evaluating the likelihood of confusion is best left for summary judgment, after the parties have gathered the facts in discovery. The "likelihood of confusion test is a fact-intensive analysis," so it "ordinarily does not lend itself to a motion to dismiss." *See Slep-Tone Ent. Corp. v. Coyne*, 41 F. Supp. 3d 707, 715 (N.D. Ill. 2014) (citing *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 412 (S.D.N.Y. 2006)).

But not always. District courts can and do dismiss complaints for failure to allege a likelihood of confusion. *See, e.g.*, *Fortres Grand Corp.*, 763 F.3d at 706 ("Because Fortres Grand has failed to plausibly allege confusion, it has failed to state a claim for trademark infringement."); *Eastland Music Grp., LLC v. Lionsgate Ent., Inc.*, 707 F.3d 869, 871 (7th Cir. 2012) ("[T]his complaint fails at the threshold: it does not allege that the use of '50/50' as a title has caused any confusion about the film's source – and any such allegation would be too implausible to support costly litigation."); *Brighter Sky Prods., LLC v. Marriot Int'l, Inc.*, 2020 WL 13885029, at *5 (N.D. Ill. 2020) ("The Court also agrees with Defendants that it is proper in this case to reach this issue during the Rule 12 phase of litigation."); *Beacon Hill Staffing Grp., LLC v. Beacon Res., LLC*, 2020 WL 7027651, at *3 (N.D. Ill. 2020).

There is nothing special about trademark cases when it comes to the pleading standards. "Allegations of consumer confusion in a trademark suit, just like any allegations in any other suit, cannot save a claim if they are implausible." *See Fortres Grand*, 763 F.3d at 700. If a complaint does not allege facts that give rise to a plausible inference of a claim, then the complaint is headed for the exits.

Buzzwords and catchphrases count for nothing at the motion-to-dismiss stage. A complaint must contain facts, not legalese or jargons. *See Slabon v. Sanchez*, 2020 WL 5763760, at *1 (N.D. Ill. 2020) ("The Court does not need to accept conclusions, boilerplate, buzzwords, or legalese. Mouthing the magic words adds air, but no weight."). A complaint rises or falls based on the facts, not the phrases. If the cupboard is bare, a district court can call out what it doesn't see.

And here, this Court doesn't see much in the complaint.  Lan-Oak doesn't even address two of the seven factors (the similarity of the products, and the degree of care by consumers).  Lan-Oak does address the other five factors, but there isn't much to say.

**1.        Similarity of the Marks**

The first factor is the similarity of the marks.  For Lan-Oak, that's a bad place to start.

Frankly, Lan-Oak's logo is so blurry that a comparison is difficult.  It feels like you're looking at a clock tower on a foggy day without your glasses.

At first glance, Lan-Oak's logo and the Lansing Journal's image might look similar.  Each image shows the clock tower from the perspective of someone standing at ground level, looking up.  Each image shows the clock tower from an angle, meaning that you can see two sides of the tower and two of the clocks.  The clock tower in each image is roughly the same size relative to the rest of the image.

But the similarity isn't that surprising.  After all, the two images show the same thing.  It wouldn't be surprising if two drawings of the Eiffel Tower looked similar.

A closer look reveals plenty of dissimilarities.  For starters, the tower in each picture is angled in a different direction.  One clock tower is turned more to the right, and the other is turned more to the left.  The pyramid roof is visible in the Lansing Journal's image, but the roof of Lan-Oak's tower is hard to see (if at all).

The time on each clock is noticeably different.  It's 1:40 p.m. in Lan-Oak's image, and it's 11:52 a.m. in the Lansing Journal's image.  They depict different sides of lunchtime.

And then there's the rest of the picture.  Lan-Oak's image doesn't have much going for it, other than the tower.  It shows a yellow funky bike rack shaped as a cyclist, but that's about it.

The Lansing Journal's image is much more lively and vibrant.  It shows a collection of street lights, buildings, and trees.  Pillowy clouds hover in the distance, looking down on the clock tower from afar.  The bike-rack cyclist isn't visible, so maybe the picture depicts the clock tower from a different vantage point.

The difference in color jumps out too.  The Lan-Oak logo uses colors that look realistic, more or less.  They match what you might expect in the real word.  But the Lansing Journal image has a blue wash – everything lives in the land of blue.  It looks like what you might expect if Andy Warhol drew the clock tower during a Blue Period.

The style isn't the same either.  The Lan-Oak image seems more realistic.  And the Lansing Journal style is more cartoonish.

The text is noticeably different, too. Lan-Oak's image says nothing. But the Lansing Journal's image says "LANSING, ILLINOIS USA." And then, an image of an airplane appears in the bottom right corner, perhaps paying homage to the Ford hangar.

Viewing the images as a whole, it is hard to see how consumers could get confused. *See AutoZone*, 543 F.3d at 929–30 ("To determine whether two marks are similar, [the Court] view[s] the marks as a whole."). They're pictures of the same thing, but that's about it.

An eyeball test isn't the only way to evaluate the similarity of the marks. A district court "must compare the marks in light of what happens in the marketplace and not merely by looking at the two marks side-by-side." *Id.* at 930 (citation omitted).

The complaint gives no reason to think that "what happens in the marketplace" leads to consumer confusion. *Id.* Lan-Oak does not give concrete examples of how it uses the mark. At best, it offers an oblique reference to advertisements and marketing materials. But the complaint doesn't allege that the Lansing Journal uses the marks for its promotional materials.

Instead, the complaint alleges that the Lansing Journal uses an image of the clock tower to sell merchandise online. That's unlike Lan-Oak, too. The complaint doesn't allege that Lan-Oak sells anything featuring the clock-tower logo.

The bottom line is simple. The two images show the same clock tower, from a similar vantage point. But the list of similarities soon ends. Plenty of dissimilarities jump out, and there is no reason to think that anyone in the marketplace gets confused.

## 2. Similarity of the Products

The second factor is the similarity of the products using the marks. Evaluating that factor is a short exercise. By the sound of things, the parties aren't selling any similar products because Lan-Oak isn't selling any products with the logo.

The complaint does not allege that Lan-Oak is using the clock-tower logo to sell any products. In fact, Lan-Oak does not discuss this factor at all in its response brief.

## 3. Area and Manner of Concurrent Use

The third factor is the area and manner of concurrent use.

The "area and manner of concurrent use" factor assesses "whether there is a relationship in the use, promotion, distribution, or sales between the goods or the services of the parties." *See CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 681 (7th Cir. 2001) (citing *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990)).

The "area" of use refers to the geographic area. *See AutoZone*, 543 F.3d at 932. And the "manner" of use refers to how the parties use the mark. *See CAE*, 267 F.3d at 682 ("[T]he

manner in which the parties use the CAE mark is similar because both parties use CAE as the first component of the names of their subsidiaries and departments.").

The parties do operate in a close geographic area. Lan-Oak and the Lansing Journal share the same hometown. They're close together – even their *names* are close.

But the manner of use is much different. At most, Lan-Oak is using its mark for unspecified marketing materials. *See* Am. Cplt., at ¶ 7 (Dckt. No. 6). The Lansing Journal uses the image of the clock tower to sell clothes and cups. *Id.* at ¶ 9.

The reader is left to wonder how Lan-Oak uses the mark in the real-world. The complaint alleges that Lan-Oak uses the mark "in marketing, advertising, and promoting various Park District events, programs, and activities to the Lansing community and the general public." *See* Am. Cplt., at ¶ 7 (Dckt. No. 6). That begs a question: what type of events and programs?

Lan-Oak's website gives lots of examples of the facilities and programs that the park district has to offer. Is it using the clock-tower logo to promote swimming lessons? The fitness center? Dance classes? Something else?

This factor might be a wash, but it probably tips in the Lansing Journal's favor. The parties do operate in the same geographic area, but they do different things. That's not likely to lead to confusion.

### 4. The Degree of Care by Consumers

The fourth factor is the degree of care that consumers likely exercise.

Lan-Oak does not address this factor, either. The complaint barely mentions consumers, except for a few boilerplate sentences about a likelihood of consumer confusion.

### 5. Strength of the Mark

The fifth factor is the strength of the marks.

"The strength of a trademark refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *CAE*, 267 F.3d at 684. "The strength of a mark usually corresponds to its economic and marketing strength." *AutoZone*, 543 F.3d at 933 (citing *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004)). "The stronger the mark, the more likely it is that encroachment on it will produce confusion." *Id.* (citation omitted).

The complaint gives no reason to think that Lan-Oak's mark has any heft with consumers. It barely alleges anything about the use of the mark at all. It seems like a stretch to think that consumers strongly associate that picture of the clock tower with anything, except a local landmark.

11

True, the complaint does allege that Lan-Oak has "actively used" the mark "for many years." *See* Am. Cplt., at ¶ 7 (Dckt. No. 6). But specifics are lacking. A general allegation about longtime use says nothing about the "economic and marketing strength of [its] mark." *See AutoZone*, 543 F.3d 933.

It is hard to imagine that consumers would associate the clock-tower logo with the park district activities. And it's difficult to imagine that the logo would drive consumers to engage in activities like swimming lessons, pickleball, gymnastics, martial arts, and so on.

The subject matter of the mark makes it unlikely that consumers would associate the mark with the park district. The mark shows a clock tower – a distinctive local landmark. In all likelihood, consumers who see the mark are likely to think about downtown, and unlikely to think about taking swimming lessons.

### 6. Actual Confusion

The sixth factor is actual confusion. If there is any actual confusion in the real world, Lan-Oak doesn't say who is confused about what.

The complaint doesn't give any examples of anyone feeling confused. For example, the complaint doesn't allege that a consumer bought a t-shirt from the Lansing Journal, and thought that he or she was getting a t-shirt associated with the park district.

At the motion-to-dismiss stage, a plaintiff doesn't have to allege actual confusion. In fact, at the summary-judgment stage, a plaintiff doesn't have to come forward with evidence of actual confusion. That type of evidence is helpful, but not required. *See CAE*, 267 F.3d at 685 ("Although evidence of actual confusion, if available, is entitled to substantial weight in the likelihood of confusion analysis, this evidence is not required to prove that a likelihood of confusion exists.") (citation omitted).

Even so, nothing prevents a plaintiff from including an allegation of actual confusion in a complaint, if there is any confusion. And here, the complaint is noticeably quiet when it comes to actual confusion.

The complaint sticks to generalities, and stops short of giving any specifics or any examples of consumer confusion. If anyone is confusing Lan-Oak's clock tower with the Lansing Journal's clock tower, the complaint never says so.

### 7. The Defendant's Intent

The last factor is the defendant's intent.

Courts "look[] primarily for evidence that the defendants are attempting to 'pass off' their products as having come from the plaintiff." *See Packman v. Chicago Tribune Co.*, 267 F.3d 628, 644 (7th Cir. 2001) (citing *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 940 (7th Cir. 1986)).

12

The complaint doesn't give any reason to think that the Lansing Journal wants the public to think that the t-shirts, sweatshirt, mugs, and water bottles are coming from the park district. Any such allegation would face an uphill battle, from a plausibility perspective.

It's hard to see why a local newspaper would intend to give the impression that its t-shirts came from the park district. It's not as if park districts tend to have valuable marks when it comes to clothing and beverage containers.

Maybe a t-shirt from the park district has extra-special market value compared to a t-shirt sold by someone else. But it seems unlikely. Park districts aren't known for having especially strong consumer allegiances when it comes to t-shirts, sweatshirts, and mugs.

The offending t-shirt on Lansing Journal's website costs only $16. *See* The Lansing Journal SHOP, https://thelansingjournal.com/shop (last visited Mar. 28, 2025). That's a pretty good deal. It's hard to imagine that the newspaper is selling more of the t-shirts based on a mistaken belief that the t-shirts came from the park district. And it's hard to imagine that the t-shirts are hot sellers based on that mistaken belief, either.

It seems unlikely that the newspaper is trying to capture a price premium by confusing customers about the origin of the t-shirts. A simpler explanation makes a lot more sense: the local newspaper is simply proud of a local landmark, and wants to share the pride.

If there is some reason to think that the Lansing Journal intended to confuse consumers, the complaint doesn't reveal what that reason is.

\*        \*        \*

This Court has marched through all seven factors, and they weigh heavily against the complaint. Lan-Oak has failed to allege facts that could give rise to a plausible inference of consumer confusion. The most confounding part of this dispute is how this dispute got this far.

## Conclusion

For the foregoing reasons, Defendant's motion to dismiss is granted.

Date:   March 28, 2025

_____

Steven C. Seeger
United States District Judge